Stephen M. Lobbin (SBN 181195)
sml@smlavvocati.com
Joshua N. Osborn (SBN 317435)
jno@smlavvocati.com
**SML AVVOCATI P.C.**
4640 Cass Street #90142
San Diego, California 92109
Tel: 949.636.1391

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Valeria Lichtman**, individually and as Trustee of the Valerie Lichtman Revocable Trust Dated June 12, 2003, and **Rene Lichtman**,<br><br>Plaintiffs,<br><br>v.<br><br>**City of Carlsbad**,<br><br>Defendant. | Case No. **'26CV0852 CAB MSB**<br><br>**COMPLAINT FOR EQUAL PROTECTION, DUE PROCESS, FIRST AMENDMENT RETALIATION, QUALIFIED IMMUNITY AND DECLARATORY JUDGMENT**<br><br>**DEMAND FOR JURY TRIAL** |

For its Complaint, Plaintiffs hereby allege as follows:

<u>Parties</u>

1. At all times alleged herein, Plaintiffs Valerie Lichtman and Rene Lichtman (hereinafter "the Lichtmans") were and are individuals and owners of the Subject Premises located at 939 Begonia Court, Carlsbad, CA (herein after "Subject Premises").

2. At all times alleged herein, the Lichtmans were and are residents of the Subject Premises.

-1-

COMPLAINT
Case No. _____

3.    At all times alleged herein, Defendant City of Carlsbad (hereinafter referred to as "City" or "Carlsbad") was a governmental entity in the County of San Diego and State of California.

General Allegations

8.    Valerie Lichtman is the owner of the Subject Premises. However, she is elderly with dementia, so her son Rene Lichtman helps her maintain the Subject Premises.

9.    In December 2014, Rene Lichtman suffered a personal tragedy of the loss of his partner. Needing a creative outlet to manage his grief, he looked into building a patio structure on the hillside in the backyard of the Subject Premises that would provide a place to take in the panoramic ocean views.

10.    Rene Lichtman performed research regarding Carlsbad retaining wall permitting; however, he was unaware of a hillside development ordinance under a different section of the code, separate from the section regarding permits.

11.    It was his understanding that according to the code section pertaining to retaining walls, he was allowed to build walls up to 4 feet high without obtaining a permit. He misunderstood, believing he could build a retaining wall so long as each tier was no higher than four feet. He broke ground in 2015.

12.    In July 2017, the Lichtmans began operating a successful vacation rental business. The Subject Premises has five bedrooms, three baths, with a swimming pool, views of the ocean from the back yard hillside retaining wall, and it is in close proximity to the Carlsbad beaches.

13.    It was not until February 10, 2019 that the Lichtmans became aware of the hillside development ordinance based on a first Notice of Violation, stating that grading permits were required for the hillside upon which the retaining wall was built.

14.    Valerie Lichtman immediately had her son Rene Lichtman contact the City, and had various written communications regarding their options as to the

-2-

retaining wall.  In particular, Rene Lichtman received an email from Jason Geldert, P.E., City Engineer with the City of Carlsbad, who gave Rene Lichtman options of obtaining a permit to remove the walls or applying for a Coastal Development Permit and Hillside Development Permit to allow the walls to remain.  Attached hereto and incorporated herein by reference as **Exhibit A** is a true and correct copy of an email dated March 29, 2019 from Mr. Geldert stating that these consisted of his "two lawful options that you may pursue."

15.    At this time, the Lichtmans chose to pursue option two, to retain the walls.  Attached hereto and incorporated by reference herein as **Exhibit B** is a true and correct copy of an email from Mr. Geldert stating that he and Carlsbad staff member Greg Fisher would "assist you on the application process.  I have included Greg on this email, he will contact you with application information."

16.    On June 9, 2019, the Lichtmans received a Final Notice regarding the hillside grading permit.  Also, as a part of Exhibit B is an email from Rene Lichtman dated June 13, 2019 to Mike Peterson with the City of Carlsbad, forwarding him Mr. Geldert's email from March 29, 2019, stating that neither Mr. Geldert nor Mr. Fisher had contacted him with the application information.

17.    Rene Lichtman then received an email from Jeremy Riddle on behalf of the City, who stated that though the Lichtmans still had the two options, the second option would in all likelihood be denied, though the City had not seen any structural or design plans, heard from any of the Lichtmans' engineers, or reviewed the evidence.

18.    The Lichtmans then retained counsel, who organized a meeting with the City, which took place June 25, 2019.  At that meeting, the Lichtmans agreed to cease any work on the walls, hire a civil engineer and submit a site plan to the City.  In addition, The Lichtmans agreed to further inspections at the City's convenience.  In return, the City agreed to forgo further citations.

COMPLAINT
Case No. _____

19. The Lichtmans immediately sought civil engineering firms, and ultimately retained Fusion Engineering on approximately July 16, 2019. Various correspondence went back and forth between Rene Lichtman, the engineer and the City regarding the specifics required for the site plan, which was submitted by the Lichtmans' engineering firm to the City July 30, 2019.

20. After another meeting with the City, the Lichtmans received further instruction from the City regarding her site plan and options for the wall. Again, the City was firm that though legally the Lichtmans had the right to pursue the option to obtain permits to keep the wall, the City would not be likely to allow the wall to stay, even without having any information regarding the wall other than the site plan. The City had already made its rejection decision.

21. On August 28, 2019, the Lichtmans submitted a Geotechnical Evaluation, which gave Fusion Engineering's professional opinion on how to retrofit the wall to ensure it met with the code standards of the City.

22. In October 2019, the Lichtmans hired JC Baldwin Construction Company to perform the work of retrofitting the wall, if approved by the City.

23. On November 14, 2019, the City sent a letter stating that it had reviewed the Lichtmans' Geotechnical report submitted to the City August 28, 2019. The City requested that the Lichtmans choose an option to remove or submit permits to keep the wall by the end of November 2019.

24. After consulting with the hired engineers and construction company, the Lichtmans made a decision, in doing so, was required to come up with substantial funds to complete the permitting process and to retain the necessary professionals. On December 10, 2019, Rene Lichtman advised the City that the Lichtmans intended to submit applications required to request that they keep the wall in place.

25. A Permit Application was submitted in March 2020. This consisted of all applications, disclosures, detailed project description, environmental impact

assessments, tentative parcel maps, impact analysis, a petition with 67 signatures of local residents in favor of keeping the wall, an updated Geotechnical Evaluation, justification for variance, examples of similar retaining walls within the City's jurisdiction that do not comport to the code applied to the Lichtmans' site plan and maps.

26.    In June 2020, the Lichtmans received a review and comments on the site plan, with a list of items to revise and on June 29, 2020, they received a first review of his Coastal Development Permit.

27.    The Lichtmans seemed to be on the City's radar, because on June 9, 2020 they received a Notice of Violation for failing to collect Transient Occupancy Tax (TOT).

28.    Two months later in August 2020, the City issued a violation stating that the Lichtmans allegedly failed to obtain a short-term vacation rental (STVR) permit.

29.    Thereafter, revisions were made and submitted in person to the City multiple times.  If the City staff deemed one item missing or incorrect in the packet of over 100 sheets of paper, the City would reject it and take no record of the attempted re-submittal.  On October 6, 2020, the City sent a Notice of Violation, though the Lichtmans and the expensive team of professionals were diligently taking all practicable steps to comply.  A true and correct copy of this Notice for Case No. 2018-0902 is attached hereto and incorporated herein by reference as **Exhibit C**, which states that the violation was based upon an inspection "conducted on 00/00/2020."

30.    The Lichtmans' Permit Applications were accepted, and a hearing was scheduled with the Planning Commission on December 16, 2020.  The planning commission recommended that the Lichtmans' applications be denied.

31.     Then on March 16, 2021, the Carlsbad City Council held a meeting, wherein after just a few moments, they upheld the Planning Commission's recommendation and denied all of the Lichtmans' permits.

32.     At all times, the Lichtmans were advised there were options legally available, but they were also told that the option of keeping the wall in place would surely be denied.  Again, this was before any evidence was presented at any level to the City.

33.     The Lichtmans had the right to apply for a variance, which they did, hoping that after the City evaluated the data from engineering and construction consultants, it would be clear that retrofitting the wall was not only the most cost-effective means, but the safest means to remedy the situation.

34.     Not only has the City allowed residential retaining walls within its City limits, well beyond what the code allows, but removing the Lichtmans' wall, according to experts hired by the Lichtmans, would damage the property and surrounding properties.

35.     Due to the location of the existing retaining wall as constructed, removing it would not only pose a threat of danger of destabilizing the slope and hillside, but removing the wall, which spans close to 100 feet long and 21 feet in height, also poses extreme challenges regarding access to the wall.

36.     Such challenges would not only cause substantial nuisance to the neighborhood, but it would also require considerable use and intrusion of and onto neighboring lots.  The Lichtmans provided the City with a petition with some 67 signatures of property owners in the neighborhood that not only supported permitting the existing wall and allowing it to remain with retro-fitting, but this clearly showed that requiring the wall be removed will cause serious concerns of neighboring residents, and could possibly result in litigation.

37.     The homes in the area of the Subject Premises are very close, and to remove the wall would include having to bring in heavy equipment, including heavy

excavators, grading and earth moving machines to move tons of masonry and soil. Trucks and equipment would have to trespass over neighbors' yards, fences would be torn down, the pool would have to be filled in, and the noise, dust and dirt would last for weeks. The Lichtmans anticipated possible litigation from neighbors. Worse yet would be that removing the wall would so destabilize the hillside, that the homes above would suffer structural damage.

38. At the City Council Meeting, Rene Licthman, his attorney, and a civil engineer and the owner of JC Baldwin Construction were present. Prior to the meeting, which was held via Zoom, the City was informed that all wished to participate and each had their own presentation to be heard by the City. Of note, JC Baldwin Construction specifically specializes in retaining walls such as the one at the Subject Premises. JC Baldwin has very specialized equipment that is able to work not only upon the sheerest of inclines, but within very small spaces. JC Baldwin intended to present evidence that they could successfully retrofit the walls to meet the standards of the City in terms of structural integrity. The Lichtmans' civil engineer agreed.

39. However, the case was immediately put to vote based upon the information in the application and without any of the Lichtmans' experts being able to make their presentation. The City Council stated the Lichtmans had not met any of the five criteria for exemption and therefore would not grant approval for the variance. The Lichtmans were denied without ever being allowed to say more than a few words at the hearing.

40. At the City Council meeting, the planning department referenced the geotechnical report done by Fusion Engineering, which stated the structural stability guidelines were missed by a few tenths of a point, so the wall was deemed "unsafe in static or seismic conditions." However, every expert the Lichtmans spoke to, two of which would testify to the contrary given the chance, disagreed that the wall was

COMPLAINT
Case No. _____

"unsafe." Though the strict structural guidelines were not met, it only meant that over time, water and erosion issues could cause the walls to shift.

41.     This wall has been in place for seven years by then, through rains and minor and even moderate seismic events, in addition to constant draining from one of the homes above the wall.

42.     On June 3, 2021 the Lichtmans were issued a letter from the City that Administrative Citation #1 had been issued on Case No. 2018-0902. Then an Administrative Citation #1 was sent dated July 7, 2021 for the same case, though the City stated it had been issued in June. Then July 23, 2021 the City stated that the same Citation for that same case was issued June 9th, 2021, giving three separate dates for the same citation. That letter dated July 23, 2021 stated that Citation #1 was issued June 9, 2021 and that Citation #3 had now been issued, however, no Citation #2 was issued or referenced.

43.     Administrative Citation #2 was issued, but not until November 5, 2021. Oddly, Administrative Citation #3 was issued before the date of Citation #2 on August 24, 2021. What is more, another Citation #3 for the same case was issued November 15, 2021. True and correct copies of these Notices are attached hereto and incorporated by reference herein collectively as **Exhibit D**.

44.     During this time, the Lichtmans were consulting with civil engineering and construction firms, on how best to go about removing the wall. They informed the City of their intent to conform to the demands, with a request for compromise that the City allow the maintenance of the STVR license. This seemingly triggered as barrage of enforcement actions, as if the City sensed weakness and intended to launch a strategic attack through fines, revocation of the STVR license and filing a nuisance lawsuit in Superior Court.

45.     In October 2021, the City provided the Lichtmans' engineering firm with a grading submittal checklist. While preparing the Grading Plans, the

engineering firm found it nearly impossible to safely remove the wall without retaining at least one tier of the wall at the toe of the slope.

46.     In December 2021, the Lichtmans' engineer submitted its Grading Plan, which required not only a wall at the toe of the slope but a second wall near the upper portion to provide the acceptable slope ratio.

47.     This situation has never been a clear-cut case.  After all, it appeared that some measure of the wall remaining would be required.  Even David Rick, of the City, stated in an email dated November 2, 2021, "If Geotech supports the approach then installing a single wall at the base sounds like a viable option to pursue."  A true and correct copy of this email is incorporated herein by reference and attached hereto as **Exhibit E**.

48.     If the Lichtmans' experts were able to present this evidence at the City Council Meeting, and it was reasonably considered, there would have been a different outcome.

49.     On May 25, 2021, the Lichtmans began receiving Notices of Violation in Case No. 2021-0393 for noise.  This entire situation began due to one disgruntled neighbor, who does not like that the Lichtmans had used the Subject Premises as a vacation rental.  This individual and two others who reside with her so harassed the Lichtmans, that they were successful in obtaining three separate restraining orders against them in San Diego Superior Court Case Numbers 37-2020-0019105-CU-HR-NC; 37-2020-00019075-CU-HR-NC; and 37-2020-00019146-CU-HR-NC, all entered September 4, 2020.

50.     The main harassing individual is Carrie Ward.  Based upon the Lichtmans' information and belief, she contacted the City regarding the wall, as she had made various false police reports and claims with the City.  All noise allegations are false.  Ms. Ward would contact the Lichtmans complaining of noise, which was children swimming at 1:00 p.m. on an August Saturday afternoon.

COMPLAINT
Case No. _____

51. The Lichtmans installed a "Noiseaware" system at the Subject Premises, which monitors noise levels. No noise issues were shown on this system on or around the dates any of the Notices for the alleged noise violations were issued.

52. Then, October 7, 2021, the Lichtmans received a Notice of Violation in Case No. 2021-0675 for operating an STVR after his permit had been revoked. The Lichtmans were still receiving seemingly parallel citations in Case No. 2020-0407 for operating an STVR without a permit, first issued in August, 2020 as referenced above, and continues to receive notices to date. It appears on case is for operating without a permit and one is for operating after a permit was revoked.

53. Currently the Lichtmans has five open cases with the City—Case No. 2018-0902 issued February 10, 2019 for the unpermitted wall, Case No. 2020-0194 issued June 9, 2020 for allegedly failing to collect the TOT Tax, Case No. 2020-0407 issued August 13, 2020 for allegedly operating an STVR without a license, Case No. 2021-0393 issued on May 25, 2021 for alleged noise, and Case No. 2021-0675 for allegedly operating an STVR after permit being revoked.

54. All were as to the same Subject Premises, most stemming from the unpermitted wall. The City would not issue the Lichtmans an STVR permit due to the existence of the wall. The Lichtmans diligently worked to remedy the issue, but the endeavor is very costly and this is also a very large project with many safety concerns.

55. At all times, the Lichtmans and their team of experts have maintained the wall should remain as the safest option. After being denied a fair hearing by the City, the variance applications were denied, only for the City to now agree that some form of the wall is necessary.

56. The City has stripped the Lichtmans' means of income by refusing to issue an STVR permit because the wall was there, though access to the wall was fully blocked, as evidenced by photos and multiple inspections by City officials and

though at all times the Lichtmans was taking meaningful steps to go through the process to remediate the code violation having to do with the wall.

57.   Then, having refused to issue his STVR permit, the City began a dual track of issuing seemingly parallel citations, one for not having a permit and one for being revoked (though in truth it was not issued), both of which he still receives to this day, though he has ceased his vacation rentals.

58.   Then the City issued a spurious citation for alleged "noise," though no evidence exists to support said citation.

59.   Finally, the City has issued citations regarding its TOT Tax of short-term vacation rentals.  As the Lichtmans were new to the STVR business, they were under the impression that their full taxation obligation was met under state and federal income tax remittals and the tax they paid the city with each annual license renewal.  The Lichtmans had never heard of a monthly tax of any kind before and were completely unaware of TOT.

60.   The City's STVR license renewal procedures require annual application form submittals with letters sent to nearby neighbors with a requirement to disclose revenue for the year of which an annual municipal tax is assessed.  The Lichtmans faithfully performed these tasks and submitted payment for the annual tax calculated at the end of each annual renewal application.  Three annual renewal applications were submitted and approved by the City without the Lichtmans ever receiving notice that they had failed to make TOT payments.

61.   The City retaliated once the Lichtmans made clear their intent to challenge the City's denial of the variance application and the City decided to invoice the Lichtmans for the full 3 years of TOT and illegally apply 3 years' worth of interest on a debt they never notified the Lichtmans about.

62.   In addition, the City has been vague in their assessment of the original tax and the City has not issued direct TOT Tax invoices to the Lichtmans for the years 2017 to 2020.

COMPLAINT
Case No. _____

63.     Attached hereto and incorporated by reference herein as **Exhibit F** is a true and correct copy of an email dated March 5, 2020 from a Kerry Jezisek from the City to various other City staff, including the Deputy City Attorney Marissa Kaweki, with a subject line "RE: Airbnb Begonia Court, Carlsbad, CA."  Attached hereto as **Exhibit G** is an invoice from the City dated September 5, 2020.

64.     This is the Subject Premises and the email was to notify staff that a violation was sent, but the case was closed as the Lichtmans had remedied the situation.

65.     On November 3, 2020, the Lichtmans tendered a check to the City in the amount of $23,604.00 in TOT taxes, a large portion of which was accrued interest for which the City had failed to notify of the debt for 3 years.

66.     As such, the Lichtmans were charged interest for an unnotified debt.

67.     Here, the City patently operated in bad faith.  The City is obligated by law under the 14th amendment to give reasonable notice and a meaningful opportunity to respond before depriving a citizen of property. Under California Revenue and Taxation Code § 4801 and § 2610.5, local governments are required to mail or deliver tax bills or notices to the last known address of the taxpayer.  Under Carlsbad Municipal Code Chapter 3.28, the City's own code states that notice shall be served personally or by depositing the notice in the United States mail.  Yet the City never issued or served a single notice for 3 years.  In fact, the City refused to issue an STVR permit until the amounts were paid including interest, though the interest was now illegal to demand.

68.     The Lichtmans failed to obtain a permit and are willing to do all required to remedy the mistake, which was not purposeful.  However, the City seeks to cripple them financially by targeting the STVR business, leaving them with no income to comply with what the City demands to remedy the wall, which is very expensive.

COMPLAINT
Case No. _____

69.     The vacation rental business has nothing to do with the wall.  The Subject Premises may be safely occupied, as there is no access to the wall, with all entry points blocked.  In addition, the wall has stood firm for more than seven years.

70.     Of the violations, one is for the wall, the second and third violations are for not having a permit that the City would not issue due to the wall.  The fourth violation was for noise that did not occur, and the fifth was for a TOT Tax the City never met their obligation to notify and demanded illegal interest on.

71.     The punishment the City has leveled against the Lichtmans far outweighs any wrongful acts on their part.  The Lichtmans have always been upstanding members of the community, contributing to it socially and economically.  The Subject Premises is a beautiful home that is impeccably kept.  All the Lichtmans wish to do is remedy the wall, without further fines, so long as he continues making progress, and to operate his STVR business, which helps the City's economy.

72.     After the filing, the Court stayed this matter on June 30, 2023, and ordered the parties to this case to mediation.  As a result of that mediation, the parties agreed that the Lichtmans would be allowed to resubmit new grading plans and request for a variance to the City planning department as a means of possibly resolving the dispute.

73.     Thereafter, the Lichtmans submitted new engineered plans ("Current Plans" or "New Plans") to the City's Planning Department to reinforce the existing hillside structure on the Property, with the least possible disturbance to the existing hillside and surrounding areas.  The New Plans call for the use of engineered soil nails to support the existing hillside structure, without the need to completely remove all the existing walls or the need to cut further into the original hillside.

74.     These Current Plans present the best overall proposal to deal with the existing hillside.  The Lichtmans' Plans do not require that the existing (original) hillside be cut into further at all.  They maintain the existing old-growth trees and

-13-

shrubs located on the top of the slope, which support the property situated at the top of the slope.  Furthermore, these Plans do not require any excavation of the existing hillside or its structure.  The Plan utilizes a series of engineered soil-nails that permanently reinforce the existing retaining walls and hillside.  Any further grading into the hillside would ultimately diminish the integrity of the properties located at the top of the slope.  Supporting this plan is the City's own statement of intent for the Hillside Development Ordinance which they state is to "minimize grading of hillsides in the Carlsbad coastal zone."  Astonishingly, the head of the City's Planning Department, Eric Lardy, has stated on the record in the 2024 Planning Commission hearing that "Engineering feasibility is not a finding for variance" clearly demonstrating the City's indifference to reasonableness, construction feasibility or safety.

75.    At the Planning Commission hearing on March 20, 2024, the Commissioners willfully ignored the advice of the Litchmans' engineering expert that a neighboring property was granted a variance where its multi-tiered wall system built without a permit and allowed to remain was unnecessary because a singular six foot wall at the bottom and within regulation was all that was needed to create more usable pad area for their pool.  The Lichtmans argued that there were perhaps over 100 of these similar wall and related structures in backyards all over the City and provided photographic evidence of the same.  At least fifteen of these structures are in the City coastal zone and located within a half-mile of the Lichtmans' property.  Most notably, the property located at 2170 Twain Avenue, Carlsbad, California ("Hom Residence"), was granted a variance for a hillside structure similar to that of the Lichtmans, based on essentially the same fact pattern of variance being granted to correct unpermitted hillside grading.  The hillside, backyard and Hom Property itself are essentially the same in just about every regard as the Lichtmans' property, yet the Hom Property was granted a variance by the City for unpermitted hillside development, whereas the Subject Property was not.

-14-

76.   At the planning commission hearing, it was noted by Commissioner Laffery that the reason for the variance application was to avoid further grading where unnecessary, among other points.  She stated on the record that grading the hillside proposed as the solution by the planning department is "infeasible and creates serious concerns over storm water drainage management, slope stability and safety of neighbors and property."

77.   The City's actions point to an obvious conclusion that the City is not motivated by good faith but instead by a pernicious desire to prevent the Lichtmans from using their property for short term rentals, and other impermissible bases including an uneven and unfair application of the law.

78.   Now, after all administrate remedies are exhausted, the Lichtmans ask for leave to have alleged violations of their Constitutional Rights be heard.

## FIRST CAUSE OF ACTION – EQUAL PROCTECTION
### (California Const. Art. I, § 7)
### (42 USC § 1983)
### (Fourteenth Amendment to the United States Constitution)

79.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

80.   Equal protection of the law is a constitutional right (CA Const. art. I, § 7), stating as follows:

"(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws; provided, that nothing contained herein or elsewhere in this Constitution imposes upon the State of California or any public entity, board, or official any obligations or responsibilities which exceed those imposed by the Equal Protection Clause of the 14th Amendment to the United States Constitution"

81.   Here the Lichtmans were denied their variance to keep their wall while others were allowed a variance.  The City directly either allowed those other

properties to have unpermitted walls, or granted a variance. This pattern of selective enforcement has no rational basis and is motivated by arbitrary decision making or unlawfully favoring other properties. *See* List of Carlsbad properties with a variance, enclosed *infra*.

### Direct City Involvement

82. The City itself, via its Planning Commission and then City Council, decided to deny the requested variance. These are the top policy makers in the City – from the Head of the Planning Commission to the Mayor.

83. All of these denials are the pattern and practice of City, actions that constitute official City policy for purposes of liability. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978).

84. This means the City's unequal treatment of the Lichtmans was their formal custom of unfairness.

### Pattern of Selective Enforcement

85. City denied the Lichtmans a variance but continues to grant variances to others with steep hillsides that are not to code.

86. Plaintiffs allege that the City, through its official policymaking bodies, including the City Council, Planning Commission, Planning Department, and Code Enforcement, engaged in a pattern of selective enforcement and retaliation, depriving Plaintiffs of equal protection under the law.

87. Plaintiffs own property located within the City in the Coastal Zone, which includes a retaining wall constructed on a hillside.

88. Other similarly-situated properties in the City, including numerous properties in the Coastal Zone, have been granted variances for retaining walls on hillsides, or have had unpermitted retaining walls that the City has declined to enforce. Notable example of granted variances being 2170 Twain Ave., Carlsbad, CA 92008, the Hom Residence. *See* **Exhibit H**, photo of Hom property, **Exhibit I**, photo of the Hom property.

-16-

COMPLAINT
Case No. _____

89.    Example properties where no enforcement against unpermitted retaining walls (estimate over 100 existing) include the following:

a.    920 Anatra Ct, Carlsbad, CA, 92011

b.    924 920 Anatra Ct, Carlsbad, CA, 92011

c.    7202 Wisteria Way, Carlsbad, CA, 92011

d.    908 Poppy Ln, Carlsbad, CA 92011

e.    1316 Shorebird Ln, Carlsbad, CA 92011

f.    7137 Tanager Dr., Carlsbad, CA, 92011

g.    7201 Manzanita St, Carlsbad, CA 92011

h.    7203 Manzanita St, Carlsbad, CA 92011

i.    7207 Manzanita St, Carlsbad, CA 92011

j.    6962 Blue Orchid Ln, Carlsbad, CA 92011

k.    7011 Mimosa Dr, Carlsbad, CA 92011

l.    7013 Mimosa Dr, Carlsbad, CA 92011

m.    904 Daisy Ave, Carlsbad, CA 92011

n.    7082 Crystalline Dr, Carlsbad, CA 92011

o.    4811 Kelly Dr, Carlsbad, CA 92008

p.    2322 Keats Pl, Carlsbad, CA 92008

q.    5246 Milton Rd, Carlsbad, CA 92008

r.    916 Grivetta Ct, Carlsbad, CA 92011

s.    920 Grivetta Ct, Carlsbad, CA 92011

t.    7204 Azalea Pl, Carlsbad, CA 92011

u.    4945 Avila Ave, Carlsbad, CA 92008

v.    4794 Neblina Dr, Carlsbad, CA 92008

w.    4926 Park Dr, Carlsbad, CA 92008

x.    4934 Park Dr, Carlsbad, CA 92008

y.    4936 Park Dr, Carlsbad, CA 92008

COMPLAINT
Case No. _____

90. On the record, the City has acknowledged its awareness of numerous properties with unpermitted retaining walls, yet it has elected not to take enforcement action against those property owners. Lafferty's clear quote in the planning commission hearing on the record saying "I have seen other properties with similar retaining walls, whether they had permits or not I can't speak to that. You wouldn't be the first to have done this, but obviously you got caught." **Exhibit J**, Lafferty transcript.

91. In addition, there are incalculable numbers of times where the City references and admits to using satellite footage of the coastal zone to observe properties. They are aware they are not enforcing the law equally.

92. Despite this, the City, acting through its Planning Commission, City Council, Planning Department, and Code Enforcement, has singled out the Lichtmans for discriminatory and arbitrary enforcement actions regarding their retaining walls.

93. The City has further attempted to compel Plaintiffs to engage in grading the hillside, despite the expert engineers warning that such grading would pose serious safety risks to the property and neighboring properties. *See* **Exhibit K**, Fusion Engineering Report, **Exhibit L**, Rivera, President of Fusion Engineering, March 2022 email.

94. The Equal Protection Clause of the Fourteenth Amendment guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

95. The City, acting under color of law, selectively enforced local laws, regulations, and policies against the Lichtmans in an irrational and arbitrary manner, treating them differently from similarly situated property owners without any legitimate basis. The City's actions were motivated by animus, bad faith, and/or retaliatory intent, and were not rationally related to any legitimate governmental interest.

COMPLAINT
Case No. _____

96.   As a direct and proximate result of the City's violations of Plaintiffs' rights under the Fourteenth Amendment, Plaintiffs have suffered damages, including but not limited to economic loss, damage to property value, emotional distress, extra and superfluous engineering and city filing costs, lost time with friends and family members who died during this fight for their rights, and legal expenses in an amount to be proven at trial.

No Rational Basis

97.   There is no reason for the City to selectively enforce impervious codes, but to proactively grant variances to the several properties described.

98.   The City will surely argue the imminent danger of the Subject Property to collapse unless and only if Plaintiffs raze the site completely or return it to its original state.  But these arguments fail because 1) no stability tests have been done, 2) the wall has not moved in years, and 3) Plaintiffs' engineers agree there is a safer and less expensive alternative to which the Lichtmans would agree.

99.   Engineering data and arguments show the soil and nail alternative to City's requirements.

100.   In particular, the Hom property at 2170 Twain Avenue proves that the City is just arbitrarily electing to not enforce against other properties.

101.   The Lichtmans will prove there is no rational basis for the disparate allowance of all of those other "dangerous" walls to remain.

Statute of Limitations is Tolled

102.   Any argument that the Statute of Limitations has passed per CMC § 65009(c) will fail because that deadline does not apply to Constitutional claims, because application would be inequitable given the facts that the administrative remedies recently were exhausted, and because the City now violates Plaintiffs' rights under the Continuing Violations Doctrine.

COMPLAINT
Case No. _____

Local Administrative Deadlines Do Not Apply to Constitutional Claims

103.   The municipal code does not outweigh the Constitution.  The court in *Bankers Hill* confirmed that the 90-day administrative deadline does not apply to constitutional or public law claims. stating "the 90 day statute is limited to administrative writs and does not apply to state or federal constitutional violations brought under § 1983." *Bankers Hill v. City of San Diego*, 74 Cal.App.5th 755 (2022).

104.   Thus, challenging the City's decision under section 65009 differs from suing for constitutional damages, and because the two arise under separate statutory frameworks.

Equity

105.   Plaintiffs could not discover the harm during the repeated applications of the variance to the City until all administrative avenues were exhausted.

106.   Because of the City allowing Plaintiffs to continually re-apply for their variance, they reasonably thought they would be granted a variance due to the danger of the City's grading plans and the fact that so many other unpermitted properties were allowed the variance for hillside slopes similar or with a steeper slope.

107.   For these reasons it would be inequitable to time bar these Constitutional Claims.

Continuing Violations Doctrine

108.   The Continuing Violations Doctrine allows otherwise time-barred claims to be considered if they are part of an ongoing pattern of illegal conduct that extends into the limitations period.

109.   The Court decided that time-barred events can be admissible to show "a pattern or practice of constitutional violations" in § 1983 cases even if the events themselves are not actionable.

COMPLAINT
Case No. _____

110. The *McDougal* case distinguished between barred claims and evidence admissibility, holding, "Although acts occurring prior to the limitations period may not themselves support recovery, they may be admissible to establish a pattern or practice." *McDougal v. County of Imperial*, 942 F.2d 668 (9th Cir. 1991).

111. Here the selective enforcement began years ago but continues to today in the same manner and method. The City denied Plaintiffs a variance but continues to grant others that are similarly situated.

112. The Ninth Circuit held that a plaintiff may allege a pattern or policy of discrimination and recover for acts occurring outside the limitations period if at least one act occurred within the limitations period. *See Gutowsky v. County of Placer*, 108 F.3d 256 (9th Cir. 1997).

113. In this case, the City may argue that the individual denials of variance in 2021, then again in 2024, are discrete acts. But these arguments fail because they are only moments in a years-long campaign of selective enforcement. Those denials are certainly related, and along with the revocation of the STVR license, and all of the violations, citations, and administrative procedures imposed before and after those times, prove this related pattern of discrimination.

114. Further, the Ninth Circuit reaffirmed that courts must look at the "entire time period of the alleged hostile environment" to determine whether there was a continuing violation. *See Douglas v. California Dept. of Youth Authority*, 271 F.3d 812 (9th Cir. 2001).

115. And a more recent case stated that discrete acts (like a single revocation here in this case) do not restart the clock, but systematic policies or patterns of retaliation may support a continuing violation claim. *See Maldonado v. Harris*, 370 F.3d 945 (9th Cir. 2004).

116. The Court in *Carpinteria* recognized that municipal policies are proved by conduct over time. Even if the statute of limitations applies to the original act or

claim, those older acts prove the policy and intent. *See Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822 (9th Cir. 2003).

117. The City will admit that if the Lichtmans applied today they would be denied, but first the City would happily take the application fees.

118. This evidences the City's unequal enforcement of its laws and code. Either these retaining walls were granted variances where Plaintiffs were denied, or the City is not enforcing its own ordinances against these owners. If the latter, this is patently discriminatory, which is prejudicial to the Lichtmans, as the City does not equally apply its laws to all citizens in practicing selective enforcement.

119. Due to the foregoing, the Lichtmans have been harmed, and the City's acts and omissions are a substantial factor in causing that harm.

120. As the City has unevenly applied its laws, choosing to enforce the code against the Lichtmans and not others, and by depriving the Lichtmans of their due process rights, the wall violation has now led to a host of other alleged violations, culminating in the Lichtmans' STVR permit being ultimately revoked. Therefore, the Lichtmans have been subject to unfair and uneven treatment under the law by the City both in 2020 and again in 2024.

121. The City is selling false hope.

**SECOND CAUSE OF ACTION – FIRST AMENDMENT RETALIATION**

**(California Const. Art. I, § 7)**

**(42 USC § 1983)**

**(First Amendment to the United States Constitution)**

122. Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

123. The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." The clause applies to any government action, whether federal, state, or local.

124.   Here Plaintiffs challenge violations of their free speech rights by showing that City officials took adverse action against Plaintiffs in response to the them engaging in protected speech – asking for a variance.

### Direct City Involvement

125.   The City revoked Plaintiffs' Short-Term Vacation Rental License once they petitioned the government by challenging the City's grading orders and hiring experts that proved alternative solutions.

126.   In direct retaliation for Plaintiffs' exercise of protected rights, including challenging the City's grading demands and seeking to protect the property and safety, the City revoked Plaintiffs' Short-Term Vacation Rental (STVR) license, depriving Plaintiffs of significant economic benefit.  To date, Plaintiffs estimate at lease $200,000 gross annually.

127.   The actions taken against Plaintiffs — including disparate enforcement regarding the retaining wall and the retaliatory revocation of the STVR license — were formally approved by the Planning Commission and City Council and carried out with the active participation and approval of the Planning Department and Code Enforcement.

128.   Accordingly, there was direct City involvement.

### Protected Expression

129.   Plaintiffs are protected by the First Amendment limitation to government interference with protected activity of applying for a variance from the City's order.

130.   Plaintiffs engaged in protected speech and petitioning activity by challenging the City's demands regarding hillside grading and the retaining walls.

131.   The City pretended to allow a variance by allowing Plaintiffs to apply for their complicated and expensive variance process.  But in reality this was a sham.

COMPLAINT
Case No. _____

Adverse Action by the City

132. In direct retaliation for Plaintiffs' exercise of these First Amendment rights, the City revoked Plaintiffs' STVR.

133. This reprimand had no legitimate basis.

134. Originally, the City cited noise violations and non-payment of TOT as the reasons for the STVR permit revocation. But Plaintiffs had paid their TOT in full including interest on a tax debt they were not notified of for 3 years. Also, Plaintiffs had installed NoiseAware Tech over a year prior and were vigilantly monitoring decibel levels during key quiet hours.

135. Later, the City stated that the Plaintiffs' STVR license could not be reinstated because of the danger of the unpermitted retaining wall. However, Plaintiffs were previously allowed to continue renting via the STVR when they roped off the hillside and retaining wall area. In fact, the City allowed 3 consecutive renewals of the STVR license while in full awareness of the wall conditions and circumstances in the backyard. *See* **Exhibit M**, Kawecki June 26, 2019 email. Illogically, the STVR was only required for guests up to 30 days. That meant that the City had no problem allowing rental guests of 31 days or more.

136. For these reasons, the City's retaliatory actions were intended to punish Plaintiffs for exercising protected constitutional rights.

Causation

137. Plaintiffs' expression that they wanted to challenge the City's denial of their variance was the motivating factor in the revocation of the STVR license.

138. Plaintiffs will prove that as a direct and proximate result of the City's violations of their rights under the First Amendment, they have suffered damages, including but not limited to economic loss, damage to property value, emotional distress, and legal expenses.

-24-

COMPLAINT
Case No. _____

## THIRD CAUSE OF ACTION – DUE PROCESS

### (California Const. Art. I, § 7)

### (42 USC § 1983, Civil Code § 52.1)

### (Fifth and Fourteenth Amendments to the United State Constitution)

139.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

140.   The substantive due process clause "guards against arbitrary and capricious government action, even when the decision to take that action is made through procedures that are in themselves constitutionally adequate." *Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1261 (9th Cir. 1994).

141.   "To establish a violation of substantive due process plaintiffs must prove that the government's action was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926).

142.   Here the City's actions have been clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare.

143.   The Planning Commission meeting and the City Council meetings were too hasty to discuss a variance request that requires tens of thousands of dollars in planning fees, several copies, forms, engineering and soil plans, drawings, and expert testimony.  These variance applications take months to prepare and the Lichtmans were only given 10 minutes to be heard.

144.   The City's actions are aimed at depriving the Lichtmans of their constitutionally guaranteed rights to life, liberty and pursuit of happiness through exercise of their right to use their property lawfully without selective, discriminatory and arbitrary governmental interference.

145.   Due to the foregoing, the Lichtmans are entitled to a judicial award of damages.

COMPLAINT
Case No. _____

**FOURTH CAUSE OF ACTION – QUALIFIED IMMUNITY**

**(California Const. Art. I, § 7)**

**(42 USC § 1983, Civil Code § 52.1)**

**(First, Fifth, and Fourteenth Amendments to the United State Constitution)**

146.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

147.   Government officials enjoy qualified immunity from civil damages unless their conduct violates clearly established statutory of constitutional rights of which a reasonable person would have known.

148.   To establish whether a government official is entitled to qualified immunity, the factors are (a) whether the official violated a statutory or constitutional right, and (b) whether that right was clearly established at the time of the challenged conduct.  *See Kekona v. City of San Diego*, 2024 U.S. Dist. LEXIS 232946 (S.D. Cal. 2024).

149.   In this case, Commissioner Lafferty violated the Lichtmans' Constitutional right to Equal Protection of the laws by allowing and granting variances to various other unpermitted home as discussed.

150.   Also, Lafferty retaliated by denying the Lichtmans Free Exercise of the First Amendment of the United State Constitution and the California Constitution, Article 1, § 7 when she denied the variance, with other unknown officials who revoked the STVR when it was unrelated to the supposed danger of the unpermitted retaining wall.

151.   Further, Lafferty denied the Lichtmans Due Process of the law when she oversaw the Planning Commission hearing that did not give a full and fair hearing on the Lichtmans' variance.  This hearing was clearly inadequate given the length, complexity and expense of the application, and requirement for expert testimony and full discussion.

-26-

152.   The Lichtmans will show that this hearing was arbitrary and unreasonable, and the pattern of this procedure is not related to the health, safety, and general welfare of the community it oversees.

153.   The Lichtmans will prove Lafferty caused damages in an amount to be proved at trial.

**FIFTH CAUSE OF ACTION — DECLARATORY/INJUNCTIVE RELIEF**

154.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

155.   An actual controversy has arisen and now exists between the Lichtmans and the City.  The Lichtmans contend that the City has wrongfully charged and taken payment of interest on TOT Taxes to which it never made notice.

156.   A judicial declaration that the City wrongfully charged this interest on TOT Taxes is necessary and appropriate at this time, as the City is currently practicing the same wrongful acts against the Lichtmans and countless other STVR owners, who may similarly be paying years of interest on unnotified debts.  The City could be collecting hundreds of thousands of dollars from its citizens in illegally applied interest to TOT debt they fail to notify on.

157.   The Lichtmans are entitled to declaratory relief as this interest was applied illegally without proper notice of the outstanding tax balance.

158.   An injunction is also necessary to prohibit the City from continuing this wrongful practice.  If not granted, the City may continue to charge taxpayers interest on unnotified tax debt, creating a huge windfall to the City to the detriment of its citizens.

159.  The Lichtmans therefore request a declaration that any interest on TOT Taxes collected from owners without timely notice were collected illegally.

161.   The Lichtmans also request that the City be enjoined from collecting the same interest on TOT Taxes collected from owners that were not timely notified.

COMPLAINT
Case No. _____

**PRAYER FOR RELIEF**

Therefore, Plaintiffs pray for the following relief:

1.     For damages according to proof;

2.     For a declaration that the City's denial of the Lichtmans' Plans and request for variance are unlawful because they violate the Lichtmans' constitutional rights to due process and equal protection of the law;

3.     For Preliminary and Final Orders enjoining the City of Carlsbad from denying the Lichtmans' Plans and request for variance, because the denial of the same is improper and violates the Lichtmans' constitutional rights to due process and equal protection of the law;

4.     For a declaration that interest on outstanding TOT Taxes collected and paid to the City of Carlsbad with the failure to notify the Lichtmans for years was unlawful;

5.     For an injunction against the City of Carlsbad from collecting the same TOT Taxes collected from Airbnb and VRBO directly from owners;

6.     For a declaration that the City's prosecution of Carlsbad City Code violation action against the Lichtmans is improper because it violates the Lichtmans' constitutional rights to equal protection, freedom of expression, and due process of the law;

7.     For Preliminary and Final Orders enjoining the prosecution of Carlsbad City Code violation action against the Lichtmans because it is improper and violates the Lichtmans' said constitutional rights;

8.     For costs of suit herein;

9.     For attorney's fees; and

-28-

COMPLAINT
Case No. _____

10.    For such other and further relief as the Court deems just and proper.


                                   Respectfully submitted,

Dated:  February 10, 2026                    **SML AVVOCATI P.C.**

                          By:   /s/ Stephen M. Lobbin
                                   Attorneys for Plaintiffs

COMPLAINT
Case No. _____